UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEROME POLVAY, individually on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| FCTI, INC., and DOES 1-10, inclusive, | |
| Defendant. | |

Plaintiff Jerome Polvay ("Plaintiff"), on behalf of himself and all persons similarly situated, alleges the following, based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations, against Defendant FCTI, Inc. ("FCTI" or the "Defendant"):

## INTRODUCTION

1. The Defendant is one of the largest deployers of automated teller machines ("ATM") in the country. The Defendant supplies ATMs to some of the most prominent convenience stores (7-Eleven) nationwide. Cash withdrawals, funds transfers, and (most relevant here) account balance inquiries are available transactions at ATMs. Banks deem these ATM activities, conducted by their accountholders, as "out of network" if they are conducted at the Defendants' machines.

2. One of the primary sources of revenue for the Defendant is the interchange fees it receives from retail banks. Interchange fees are paid by the retail banks to the Defendant each time a retail bank accountholder makes a cash withdrawal, funds transfer, or (most relevant here) account balance inquiry at one of the Defendant's ATMs. When accountholders undertake balance inquiries at out-of-network ATMs, their home banks will typically assess an out-of-network ATM fee for doing so. For each fee assessed, retail banks pay an "interchange fee" of approximately $0.25 to the Defendant because it owns the ATM where the balance inquiry was conducted. Retail

1

banks also pay a "switch fee" to the network provider (for example, "Plus" or "Star" networks). Therefore, the Defendant profits from the accountholder's out-of-network balance inquiries.

3. This case arises from the Defendant's deceptive and unlawful practice of systematically doubling the number of out-of-network ATM balance inquiries at its machines. The Defendant has a monetary incentive to generate as many balance inquires as possible. This has led the Defendant to concoct a scheme in which it presents a non-balance inquiry screen prompt at the machine, but transmits a balance inquiry request to the bank anyway, resulting in the customers' banks assessing the customers unwarranted out-of-network balance inquiry fees, with the Defendant receiving a portion of it in the form of the interchange fee for each such instance.

4. Specifically, FCTI's ATM machine interface first shows a prompt asking if the customer would like to check their balance and continue with the transaction. If the customer presses the "yes" button, then FCTI transmits a balance inquiry request to the customer's bank, which results in both the display of the balance information on the ATM machines, and the bank's assessment of an out-network balance inquiry fee on the customer's account. Plaintiff does not challenge this first balance inquiry. However, after the customer has inquired, received, and paid for the balance information, FCTI's interface then presents a second prompt which asks: "Would you like to print your Balance and continue the Transaction?" This second question presented to customers is simply not a balance inquiry prompt. It instead asks customers whether they would like to print the balance information the customers already inquired, paid for, and is displayed on the screen while continuing to make a cash withdrawal.

5. The very word "inquiry" is defined as asking for information. Here, the customers already inquired their balance information and this second prompt simply asks if they would like to print the already inquired balance information on a receipt while simultaneously proceeding to the cash withdrawal. Furthermore, pressing the "Continue" button on this prompt is the only way for customers to proceed directly to the intended cash withdrawal.

6. Customers, including Plaintiff, have been charged two fees – and FCTI received a portion of each fee in the form of interchange fees – despite making only one balance inquiry at

the Defendant's ATMs. Plaintiff and members of the Class (defined below) seek to recover wrongfully attained funds as well as statutory damages from the Defendant pursuant to New York General Business Law ("GBL") N.Y. GBL § 349. Plaintiff and members of the putative Class have been injured by the Defendant and bring a claim for violation of the GBL against the Defendant, seeking damages, statutory damages, restitution, injunction, and other appropriate relief.

## PARTIES

7. Plaintiff Jerome Polvay is a citizen and resident of Asbury Park, New Jersey and a TD Bank checking account holder.

8. Defendant FCTI, Inc. is a California corporation, with its headquarters and principal place of business located in Los Angeles, California. FCTI is also one of the nation's largest independent operators of stand-alone ATM machines with over 30,000 such machines in service. FCTI operates ATMs, and thus conducts business, throughout the United States, including in this district.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over the action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class embers exceed $5 million, exclusive of interests and costs, and at least one member of the proposed Class is a citizen of a different state than the Defendant.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND

**A. FCTI was Incentivized to Artificially Increase the Number of Balance Inquiries at its Machines**

11. FCTI unlawfully utilized its ATM screen interface to register balance inquiries through non-balance-inquiry prompts. The Defendant then transmitted coded "balance inquiries" to the customers' retail banks. The retail banks automatically accepted the Defendant's coding, assumed the balance inquiries made at "out-of-network" ("OON") ATMs were valid, and assessed OON fees against Plaintiff's account. After collecting the fee, the retail banks then paid approximately $0.25 to the Defendant in the form of an "interchange fee."

12. Based on this interchange fee, the Defendant received a directly traceable and standardized amount of money from retail banks each time it misled Plaintiff and other customers into engaging in a purported OON balance inquiry at one of its ATMs machines:

> In ATM transactions, the consumer may pay a foreign fee to his or her bank if the ATM used is not owned by his or her bank. The consumer may also pay a surcharge fee to the ATM owner. The ***issuing bank pays an interchange fee to the ATM owner for the consumer's use of that ATM*** and also pays a switch fee to the ATM network for transmitting the transaction information.

*See* "A Guide to the ATM and Debit Card Industry, 2003 Federal Reserve Bank of Kansas City" ("KC Federal Reserve ATM Guide"), at pp. 5-6 (emphasis added).[1] The report by the Federal Reserve Bank of Kansas City clearly illustrates and describes the traceable nature of this practice in the following flow chart (*id.* at p. 38):

---

[1] https://www.kansascityfed.org/publicat/PSR/BksJournArticles/ATMPaper.pdf



13. An interchange fee is a payment by the card-issuing bank to the ATM owner to compensate the owner for the expense of installing and maintaining the ATM. Different types of ATM activities carry different interchange fees. Visa's Plus and Mastercard's Cirrus, for example, set a fee of 50 cents for a withdrawal and **25 cents for either a balance inquiry** or an inter-account transfer. *Id*. (emphasis added). While the networks set the interchange fee amounts, the banks are required to pay the Defendant the preset amount on a per transaction basis.

14. As set forth in greater detail below, Plaintiff was assessed a balance inquiry fee as a result of using one of the Defendant's ATMs. In these transactions, Plaintiff utilized a Visa-branded debit card issued from TD Bank. Visa publishes an annual schedule of its interchange reimbursement fees. The April 2019, "Visa USA Interchange Reimbursement Fees; Visa Supplemental Requirements" provides that the interchange reimbursement fee for ATM Balance

Inquiries is set at $0.25 per transaction:

| Other ATM Non-Cash Disbursement Transactions | |
|---|---|
| ATM Decline Fee | $0.25 |
| ATM Balance Inquiry Fee | $0.25 |
| ATM Funds Transfer Fee | $0.25 |
| ATM Mini Statement Fee | $0.30 |
| ATM Shared Deposit Fee | $2.50 |
| Plus Alternative Media Fee (Paid by acquirer) | $0.10 |

*See* Visa USA Interchange Reimbursement Fees; Visa Supplemental Requirements, April 2019, at p. 18.[2] Accordingly, *every time* the Defendant registers a balance inquiry request through a non-balance-inquiry prompt, the Defendant receives $0.25 (or a portion thereof) from the out-of-network balance inquiry fee assessed by retail banks, which is directly traceable to the customer's account.

15.      Thus, the Defendant has a monetary incentive to increase the total number of out-of-network balance inquiries that are performed at its ATMs by Plaintiff, as it received interchange fees directly from retail banks for each balance inquiry performed by Plaintiff and other customers at the OON ATMs. As the Federal Reserve Bank of Kansas City observed:

> There are two measures of network volume: transaction and switch. ATM transaction volume includes the total number of deposits, withdrawals, transfers, payments and **balance inquiries performed** on ATMs in the network, whether or not those transactions are transmitted through a network data center. This measure is relevant, in part, because **interchange fees paid to ATM owners are based on transaction volume.**

*See* KC Federal Reserve ATM Guide, at p. 20 (emphasis added).

16.      As set forth in greater detail below, the Defendant employed a non-balance-inquiry screen prompt to register a second balance inquiry, thereby fraudulently doubling the amount of interchange fee revenue it receives from customers' use of its machines.

---

[2] Upon information and belief, Visa's interchange rules or similar rules set by other networks apply to all ATM machine activities owned by ATM Defendants.

### B. Consumers' Experience and Reasonable Expectations in Utilizing ATM Machines.

17. Customers, including Plaintiff, use ATMs almost exclusively to make fast and convenient cash withdrawals. In 2018, there were 5.1 billion ATM cash withdrawals—more than twice as many as over-the-counter withdrawals at financial institution branches (2.1 billion). The 2019 Federal Reserve Payments Study, at p. 12.[3] The ATM Defendants have known for years that the vast majority of customers who come to use their ATM machines are there to perform only a cash withdrawal.

18. In 2002, approximately 77% of the average transaction mix at retail bank ATMs were cash withdrawals, while balance inquiries only made up 11% of all activities. *See* KC Federal Reserve ATM Guide, at p. 119, n. 6.[4] The number of balance inquiry transactions at the Defendant's ATMs has declined even further since 2002, due to the rapidly increasing availability of cost-free alternatives, like checking a balance on a mobile app, phone banking, or online access. In other words, paying for a balance inquiry at an ATM is not a rational act for the vast majority of consumers with so many no-cost alternatives which can be conducted anywhere at any time.

19. Furthermore, retail bank customers are accustomed to having to affirmatively ***opt-in*** to perform balance inquiry transactions. Every major retail bank in New York, including the top seven banks by total number of branch locations in New York,[5] uniformly present a "menu" screen to their customers at the beginning of an ATM transaction on their bank-owned ATMs. This screen allows users the clear choice as to whether or not they would like a balance inquiry or, as is much more likely, go straight into making a cash withdrawal.

20. For example, when a TD Bank customer enters their ATM card into a TD Bank ATM, after they enter their PIN, they are greeted by a ***menu*** of transaction options ("Menu"). At TD Bank, the Menu options are as follows:

- Deposit

---

[3] https://www.federalreserve.gov/newsevents/pressreleases/files/2019-payments-study-20191219.pdf
[4] https://www.kansascityfed.org/documents/6674/GuideATM_DebitCardIndustry_2003.pdf
[5] 1. Chase – 662 locations; 2. Bank of America – 271 locations; 3. KeyBank – 268 locations; 4. TD. Bank – 262 locations; 5. M&T Bank – 245 locations; 6. Citibank – 214 locations; and 7. Community Bank – 167 locations.

- Mini Statement
- Transfer
- ATM Preferences
- Personalized Fast Cash
- Withdrawal
- Balance Inquiry

21. In order for a TD Bank customer to check their balance, they are required to affirmatively press the "Balance Inquiry" button. This set-up makes sense.

22. Importantly — accountholders of all retail banks, including Plaintiff, have become accustomed to receiving a receipt at the conclusion of their cash withdrawal transactions conducted at their home bank's ATM machines. For instance, TD Bank accountholders, including Plaintiff, are asked if they would like to receive a printed receipt from the TD Bank ATM *at the conclusion of every cash withdrawal transaction*, which sets forth their resulting account balance following the withdrawal. The same holds true for every major bank in New York, including the largest seven banks: their customers are always presented with a separate screen prompt that asks them if they would like a receipt with their account balance on it—free of charge—at the conclusion of a cash withdrawal transaction.

23. In fact, financial institutions are uniformly required to provide customers the option of receiving a receipt after they complete a funds transfer (which includes a cash withdrawal) free of charge. *See* 12 C.F.R. § 1005.9. Consumers are accustomed to receiving a receipt with their account balance information printed on it following a cash withdrawal transaction at an ATM—free of charge—when they use their home bank's ATM machines.

24. In the face of the above-mentioned realities, the Defendant instead utilized an ATM interface that prevents customers from being able to directly elect which type of transaction they would like to engage in, while forcing customers to pay for the printing of receipts for the transaction.

### C. FCTI's Double Balance Inquiry Scheme

25. ATM operators, including FCTI, utilize "Balance Inquiry At Start" screen prompts at their ATMs to increase their interchange revenue.

26. "Balance Inquiry At Start" refers to the reordering of ATM screen prompts so that the first screen a customer encounters, following PIN entry, is an immediate prompt to view their available account balance. The adoption of "Balance Inquiry at Start" resulted in a significant increase in balance inquiries made at the beginning of every transaction, prior to the actual cash withdrawal. Indeed, consumers began to believe such balance inquiries were part and parcel of the cash withdrawal they intended to make when they walked up to the ATM. Several industry forums have touted the financial benefits to Independent ATM deployers ("IADs") of utilizing Balance Inquiry at Start. For example:

> Many IADs do not include balance inquiries as an option during a transaction. Although the ATM doesn't charge the customer, **IADs can derive significant interchange revenue from these transactions. ATMs that are set to suggest balance inquiries at the start of transactions can expect a significant increase in the number of balance inquiries** performed by the machine.

*See* ATM Atom, at http://www.atmatom.com/5-ways-to-boost-atm-portfolio-profitability/ (last viewed July 11, 2018) (emphasis added).

> Enable "balance inquiry at start" on Every ATM—an easy step to make, **"Balance Inquiry at Start" can increase your balance inquiries 20 to 30 percent**—at minimal cost. By making this slight adjustment in programming, the incremental revenue it produces can make quite a difference.

*See* ATM Marketplace at https://www.atmmarketplace.com/blogs/five-ways-to-increase-atm-profitability/ (last viewed July 11, 2018) (emphasis added).

> Once Balance Inquiry At Start is enabled, **deployers can expect between 20-30 percent of their transactions to be balance inquiries**, whereas before such transactions might have been 10 percent or less.

*See* Slawsky, Richard, *Five Ways to Boost the Profitability of an ATM Portfolio,* ATM Marketplace White Paper, 2011, at 2 available at: http://www.grantvictor.com/pdfs/Five

9

%20Ways%20to%20Boost%20ATM%20Profitability.pdf (last viewed July 11, 2018) (emphasis added).

27. However, FCTI took this scheme much further to unconscionable ends by designing an ATM interface that erroneously registers two balance inquiries, resulting in the assessment of two out-of-network balance inquiry fees by Plaintiff and other customers' home banks, even though they (at most) undertook a single balance inquiry. FCTI knowingly and/or willfully engages in this practice to increase its interchange revenue by a factor of two.

28. Indeed, no consumer in his right mind would undertake two balance inquiries on a single ATM use. It would be nonsensical to do so.

29. Upon entering their PIN, customers, including Plaintiff, were immediately presented with FCTI's version of a "Balance Inquiry at Start" screen prompt:



30. As mentioned above, "Balance Inquiry at Start" is a deceptive practice to begin with it as pushes onto customers needless balance inquiry transactions and the resultant OON balance inquiry fees when customers overwhelmingly intend to withdraw cash at an ATM.

31. In any event, when Plaintiff and other customers press the "yes" button, they are shown the following screen whereby they are to select which account's balance they would like to inquire about:



After selecting "Checking," FCTI transmits a balance inquiry request through the ATM network to the customer's bank. The bank then provides the balance information through the network back to the ATM machine for the customer to view. The bank then automatically assesses the customer an OON balance inquiry fee and becomes liable to pay the interchange fee through the ATM networks back to FCTI.

Customers are then presented with the following screen which provides the balance information to the customer by displaying it prominently on the screen, while asking if the user would like "to print your Balance and continue the Transaction":



32.     This second prompt presented to customers is simply not a balance inquiry prompt. It instead asks customers whether they would like to print the balance information the customers already inquired, paid for, and is displayed on the screen while continuing to make a cash withdrawal.

33.     The very word "inquiry" is defined as a request for information.[6]  Here, this second prompt is not asking the customer if they would like to request *information* regarding their account balance.  Instead, the customers already inquired their balance information and this second prompt simply asks if they would like to print the already inquired balance information on the receipt while simultaneously proceeding to the cash withdrawal.  Furthermore, pressing the "Continue" button on this prompt is the only way for customers to proceed directly to the intended cash withdrawal.

34.     However, when customers press the "Continue" button, FCTI sends a second balance inquiry request to the customers' bank, which automatically triggers the assessment of a second OON Fee for a balance inquiry by the customers' bank and the payment of the second interchange fee to FCTI.

---

[6] "Inquiry." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/inquiry. Accessed 22 Mar. 2022.

35.     Consumers, including Plaintiff, could not have reasonably understand that they could be assessed an OON balance inquiry fee through this second prompt that is: 1) already showing the balance information they inquired and paid for, and 2) not even asking if the customer would like to inquire their balance information. Indeed, it is impossible for customers to make a balance inquiry through this prompt since the question and the button options presented, as designed by FCTI, have nothing to do with making a balance inquiry. There is no "request for information" regarding their account balance. Indeed, it would be absurd for any customer to inquire the balance information of the same account within seconds, while the results of the first inquiry is still on the screen.

36.     Yet, in each case, FCTI customers, including Plaintiff, were charged **two** separate OON balance inquiry fees by their home banks after performing **one** balance inquiry. FCTI, in turn, received a second interchange fee for each of the additional, unwarranted balance inquiries that the accountholders never performed.

37.     Accordingly, Plaintiff and the Class are entitled to restitution of the second, unwarranted interchange fees FCTI received for the fraudulent and invalid balance inquiries.

**D.  Plaintiff's Experience**

38.     On October 12, 2021, Plaintiff places his TD Bank ATM Debit card into the FCTI ATM located at a 7-Eleven convenience store at 1239 2nd Avenue, New York, New York to make a quick $40.00 cash withdrawal. Plaintiff places his card into the machine and entered his PIN. He was immediately asked (consistent with paragraph 29 above):

**Would you like to view your account balance?**

39.     Plaintiff was confused – believing that he might have pressed the wrong button the menu screen. He did not realize that a menu screen had not been presented because he was in a hurry. Wanting to get to his intended cash withdrawal, he quickly pressed "YES" and viewed his account balance. The next screen asked him if he would like to "print [his] Balance and continue the Transaction?" Still confused, but wanting to get to the cash withdrawal, he pressed, "continue." At that point, a receipt was printed and his transaction was abruptly ended. The next screen asked him to re-enter his PIN. At that point, he was again asked if he would like a receipt for the

13

transaction, and then was finally presented the main menu screen throughout which he was able to select the cash withdrawal option and withdraw cash. Plaintiff does not recall seeking another balance inquiry.

40. Following his transaction, Plaintiff was surprised to learn that he was assessed, in addition to the cash withdrawal surcharge paid to FCTI ($2.95), two separate $3.00 fees from TD Bank for making balance inquiries, and an additional $3.00 fee from TD Bank for making a cash withdrawal. He was charged $11.95 in total fees for making a $40.00 withdrawal. Plaintiff is only challenging the second, phantom balance inquiry fee.

41. Had Plaintiff known that FCTI would register a second OON balance inquiry during the same transaction through a non-balance inquiry prompt, he would have considered other options for reviewing his account balance.

42. Immediately following his transaction, TD Bank twice debited a $3.00 OON ATM fee from her account directly related to his supposed requests for balance inquiries. TD Bank then forwarded approximately $0.25 of the $3.00 collected, with FCTI receiving all or portion of this amount.

43. Plaintiff intends to continue to use third party ATMs, including ATMs owned by FCTI at times when he finds them convenient, when he does not have time to visit his home bank's ATM. Plaintiff is seeking an injunction to prevent himself and others from being misled in the future by the FCTI screen prompts. Because ATM transactions are so common, the likelihood of Plaintiff falling victim to this improper business practice persists in the future.

## CLASS ALLEGATIONS

44. Plaintiff brings this action on his own behalf and all others similarly situated. The Class includes:

> All holders of a checking account who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed more than one fee for a balance inquiry during the same visit at a FCTI ATM in the State of New York (the "FCTI Class").

45. Excluded from the Class is Defendant, its subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which the Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

46. Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a Subclass(es) if necessary before this Court determines whether certification is appropriate.

47. The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to Class discovery, the Class consists of thousands of members or more, the identify of whom are within the exclusive knowledge of and can be ascertained by resorting to the Defendant's and related bank's records. Defendant has the administrative capability through its computer system and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

48. The questions here are ones of common or general interest such that there is a well-defined community of interest among the Class members. These questions predominate over questions that may affect only individual class members because the Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, but are not limited to:

   a. whether the Defendant improperly received interchange fees from financial institutions resulting from improper out-of-network balance inquiries;
   b. whether a prompt asking if customers would like to print the balance information which the customers already inquired, paid for, and have displayed on the screen and continue with the cash withdrawal transaction, does not constitute a balance inquiry;
   c. whether FCTI transmitted two balance inquiry requests during the same ATM visit;
   d. whether such conduct enumerated herein is deceptive;
   e. whether the Defendant violated the GBL; and

    f.   whether Plaintiff and other members of the Class have sustained financial losses as a result of the Defendant's wrongful business practices described herein, and the proper measure of restitution and damages.

49. It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

50. Plaintiff's claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practice by the Defendant, as described herein.

51. Plaintiff is more than an adequate representative of the Class in that he has suffered damages as a result of the Defendant's improper business practices. In addition:

    a.   Plaintiff is committed to the vigorous prosecution of this action on behalf of himself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

    b.   There is no conflict of interest between Plaintiff and the unnamed Class members;

    c.   Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

    d.   His legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

52. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

53. The Defendant has acted, or refused to act, on grounds generally applicable to the

Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

54. All conditions precedent to bringing this action have been satisfied and/or waived.

## FIRST CAUSE OF ACTION

**VIOLATION OF THE GENERAL BUSINESS LAW**
**N.Y. General Business Law § 349**
(Against Defendant on Behalf of the FCTI Class)

55. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

56. GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce, or in the furnishing of any service" in the State of New York.

57. FCTI knowingly and/or willfully committed deceptive and fraudulent practices in offering ATM services in the State of New York in violation of GBL § 349 by employing ATM machines that register balance inquiry requests through non-balance-inquiry prompts through which customers could not have made a balance inquiry. Plaintiff and members of the Class, acted reasonably in believing that a balance inquiry would not be transmitted to their banks through non-balance-inquiry ATM prompts.

58. FCTI's unfair business practices are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class. The deception was in a material respect as to whether the consumers' transactions were valid, second balance inquiries.

59. As a result of FCTI's violations of the GBL, Plaintiffs and members of the Class have paid, and/or will continue to pay, OON balance inquiry fees to their home banks, a portion of which is received by FCTI in the form of interchange fees, and thereby have suffered and will continue to suffer financial harm. FCTI is liable to Plaintiff and the proposed Class because those funds from interchange fees are directly traceable from the OON balance inquiry fee assessed by all retail banks and directly result from FCTI's unlawful conduct.

60. In addition, FCTI's conduct continues to deceive the general public. FCTI's invalid and fraudulent ATM screen prompts are likely to deceive current and prospective consumers making corresponding public injunctive relief necessary.

61. Therefore, Plaintiff and the FCTI Class seek damages, statutory damages, treble damages, restitution, injunctive relief and other appropriate relief as prayed for below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant for himself and the FCTI Class members as follows:

(a) Certifying this matter as a class action;

(b) Designating Plaintiff as appropriate Class representative and his counsel as Class Counsel;

(c) Declaring FCTI's ATM screen prompts deceptive and violative of GBL § 349 and enjoining FCTI from using any deceptive ATM screen prompts prohibited by GBL § 349;

(d) Restitution of all relevant interchange fees paid to FCTI as a portion of the unwarranted OON balance inquiry fees assessed to Plaintiff and the Class, in an amount to be determined at trial;

(e) Disgorgement of the ill-gotten gains derived by FCTI from its misconduct;

(f) Statutory, punitive, and actual damages, in an amount according to proof;

(g) Treble damages based on the Defendant's willful and/or knowing violation of GBL § 349;

(h) Pre-judgment interest at the maximum rate permitted by applicable law;

(i) Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

(j) Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: May 25, 2022

*/s/ Gary F. Lynch*
**LYNCH CARPENTER, LLP**
Gary F. Lynch
gary@lcllp.com
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243

**LYNCH CARPENTER, LLP**
Todd D. Carpenter
todd@lcllp.com
(Eddie) Jae K. Kim
ekim@lcllp.com
1350 Columbia St., Ste. 603
San Diego, California 92101
Telephone: (619) 762-1900

*Attorneys for Plaintiff and the Proposed Class*