**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEROME POLVAY, individually on behalf of himself and all others similarly situated, | Case No.: 1:22-cv-04315-JSR |
| Plaintiff, | **Hearing Date:  March 17, 2023** |
| vs. | **Time:         3:00 p.m.** |
| FCTI, INC., and DOES 1-10, inclusive, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION................................................................................................. 1

II.     STATEMENT OF FACTS .................................................................................. 4

      A.      General Background ................................................................................. 4

      B.      FCTI's Deployment of the Continue/Cancel Prompt was Uniform. ..................... 5

      C.      FCTI's Liability will be Established with Common Proof....................... 9

      D.      The Banks Uniformly Receive FCTI's Balance Inquiry Requests and Uniformly Assess OON Fees ................................................................. 10

      E.      Plaintiff has Established a Methodology to Ascertain Class Membership and Damages........................................................................................ 11

III.    LEGAL STANDARD ....................................................................................... 11

IV.     ARGUMENT ..................................................................................................... 12

      A.      Mr. Polvay and the Proposed Class Satisfy the Rule 23(a) Prerequisites............ 12

            1.      Numerosity.................................................................................. 12

            2.      Commonality................................................................................ 12

            3.      Typicality..................................................................................... 14

            4.      Adequacy ..................................................................................... 15

      F.      The Class Should be Certified Under Rule 23(b)(3) ........................... 16

            1.      Common Issues Predominate........................................................ 16

            2.      Class Membership and Damages are Ascertainable ................................. 21

            3.      A Class Action is Superior to Other Methods of Adjudication ............... 24

V.      CONCLUSION .................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Pipe & Const. Co. v. Utah*,
  414 U.S. 538 (1974) ........................................................................................ 20

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................... 12, 17

*Baron v Pfizer, Inc.*,
  42 AD3d 627 (2007) ...................................................................................... 18

*Bolanos v. Norwegian Cruise Lines Ltd.*,
  212 F.R.D. 144 (S.D.N.Y. 2002) ................................................................... 16

*Brecher v. Republic of Argentina*,
  806 F.3d 22 (2nd Cir. 2015) ........................................................................... 21

*Can't Live Without It, LLC v. ETS Express, Inc.*,
  287 F.Supp.3d 400 (S.D.N.Y. Jan. 15, 2018) ............................................... 17

*Chery v. Conduent Educ. Servs., LLC*,
  No. 1:18-CV-75, 2022 WL 179876 (N.D.N.Y. Jan. 20, 2022) ..................... 23

*Chufen Chen v. Dunkin' Brands, Inc.*,
  954 F.3d 492 (2d Cir. 2020) ........................................................................... 17

*Consolidated Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2nd Cir. 1995) ........................................................................... 12

*de Lacour v. Colgate-Palmolive Co.*,
  338 F.R.D. 324 (S.D.N.Y. April 23, 2021) .............................................. 19, 22

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2nd Cir. 2006) ......................................................................... 15

*Dupler v. Costco Wholesale Corp.*,
  249 F.R.D. 29 (E.D.N.Y. Jan. 31, 2008) ....................................................... 19

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. 2014) ................................................................... 18

*Eidelman v. Sun Products Corp.*,
  2022 WL 1929250 (2nd Cir. 2022) ................................................................ 17

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases (cont.)**

*Famular v. Whirlpool Corp.*,
  2019 WL 1254882 (S.D.N.Y. Mar. 19, 2019) ............................................................ 19, 22, 23

*Famular v. Whirlpool Corp.*,
  No. 16 CV 944 (VB), 2021 WL 395468 (S.D.N.Y. Feb. 3, 2021) ......................................... 20

*Fink v. Time Warner Cable*,
  714 F.3d 739 (2d Cir. 2013) ................................................................................. 17

*Gawarecki v. ATM Network, Inc.*,
  No. 11-CV-1923 SRN/JJG, 2014 WL 2600056 (D. Minn. June 10, 2014) ............................ 23

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
  8 F. Supp. 3d 467 (S.D.N.Y. 2014) ......................................................................... 18

*Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*,
  317 F.R.D. 374 (S.D.N.Y. Oct. 4, 2016) ............................................................ 19, 20, 21

*Goshen v. Mutual Life Ins. Co. of New York*,
  98 N.Y. 2d 314 (2002) ........................................................................................ 17

*Hasemann v. Gerber Products Co.*,
  331 F.R.D. 239 (E.D.N.Y. Mar. 31, 2019) .................................................................. 19

*In re Amla Litig.*,
  328 F.R.D. 127 (S.D.N.Y. 2018) ............................................................................ 23

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...................................................................... 24

*In re Petrobras Securities*,
  862 F.3d 250 (2nd Cir. 2017) ........................................................................... 22, 24

*In re Scotts EZ Seed Litig.*,
  304 F.R.D. 397 (S.D.N.Y. 2015) ......................................................................... 13, 19

*In re Sumitomo Copper Litig.*,
  194 F.R.D. 480 (S.D.N.Y. 2000) ............................................................................ 21

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) .................................................................................. 21

**TABLE OF AUTHORITIES (cont.)**

**Page(s)**

**Cases (cont.)**

*Kaplan v. Gelfond,*
    240 F.R.D. 88 (S.D.N.Y. 2007) ............................................................................................ 15

*Kurtz v. Kimberly-Clark Corp.,*
    321 F.R.D. 482 (E.D.N.Y. 2017) .................................................................................... 18, 23

*Ligon v. City of New York,*
    288 F.R.D. 72 (S.D.N.Y. Feb. 11, 2013) ................................................................ 11, 12, 14

*Marisol A. v. Giuliani,*
    126 F.3d 372 (2nd Cir. 1997) ........................................................................................... 14

*Moore v. PaineWebber, Inc.,*
    306 F.3d 1247 (2nd Cir. 2002) ......................................................................................... 16

*MSP Recovery Claims, Series LLC v. Takeda Pharms. Am., Inc.,*
    No. 19 CIV. 5610 (NRB), 2021 WL 4461773 (S.D.N.Y. Sept. 29, 2021) ............................ 20

*Olander v. Staples, Inc.,*
    802 F. 289 (2nd Cir. 2015) ............................................................................................... 17

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.,*
    85 N.Y.2d 20, 647 N.E.2d 741 (1995) .............................................................................. 18

*Parker v. Time Warner Entm't Co. L.P.,*
    331 F.3d 13 (2nd Cir. 2003) ............................................................................................. 11

*Price v. L'Oreal USA, Inc.,*
    No. 17 CIV. 614 (LGS), 2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018) ................................ 18

*Pyke v. Cuomo,*
    209 F.R.D. 33 (N.D.N.Y. 2002) ........................................................................................ 25

*Reyes v. Altamarea Grp., LLC,*
    No. 10-CV-6451 RLE, 2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) .................................. 25

*Robidoux v. Celani,*
    987 F.2d 931 (2nd Cir. 1993) ........................................................................................... 14

*Rodriguez v. It's Just Lunch Int'l,*
    No. 07-CV-9227 (SHS), 2018 WL 3733944 (S.D.N.Y. Aug. 6, 2018) ................................. 23

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

**Cases (cont.)**

*Rodriguez v. It's Just Lunch, Intern.*,
   300 F.R.D. 125 (S.D.N.Y. May 14, 2014) .............................................................. 19

*Sharpe v. A&W Concentrate Co.*,
   No. 19-CV-768 (BMC), 2021 WL 3721392 (E.D.N.Y. July 23, 2021)................... 19

*Stutman v Chemical Bank*,
   95 NY2d 24 (2000) ............................................................................................... 18

*Sykes v. Mel Harris and Associates, LLC*,
   285 F.R.D. 279 (S.D.N.Y. Sep. 4, 2012) ......................................................... 19, 23

*Sykes v. Mel S. Harris and Associates LLC*,
   780 F.3d 70 (2nd Cir. Feb. 10, 2015)........................................................ 16, 17, 21

*United States v. City of New York*,
   276 F.R.D. 22 (E.D.N.Y. 2011) ............................................................................ 16

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .............................................................................................. 13

**Statutes**

N.Y. Gen. Bus. Law § 349...................................................................................... passim

N.Y. Gen. Bus. Law § 349(a), (h) ................................................................................ 17

**Rules**

Fed. R. Civ. P. 23 ........................................................................................... 11, 21, 24

Fed. R. Civ. P. 23(a) ..................................................................................................... 12

Fed. R. Civ. P. 23(a)(1) ................................................................................................ 12

Fed. R. Civ. P. 23(a)(2) ................................................................................................ 12

Fed. R. Civ. P. 23(a)(3) ................................................................................................ 14

Fed. R. Civ. P. 23(b) ..................................................................................................... 16

Fed. R. Civ. P. 23(b)(3)..................................................................................... 12, 16, 24

## I.      INTRODUCTION

This class action involves a uniform ATM screen interface utilized by third party ATM operator Defendant FCTI, Inc. ("FCTI" or "Defendant") that has been roundly condemned by the financial industry as it incorporates a bait-and-switch scheme that results in customers being assessed double balance inquiry fees when authorizing only a single balance inquiry transaction.

FCTI is the second largest independent ATM operator in the country and it owns and operates the ATM machines located in every 7-Eleven convenience store throughout the country, including those in New York. Consumers primarily utilize FCTI's ATMs as a convenient way to withdraw cash. But unlike the ATMs operated by virtually all banks throughout the country, FCTI's ATMs do not open each transaction with a main menu screen that allows customers to be able to directly select their desired cash withdrawal transaction, but instead FCTI's ATMs uniformly insert at the opening of every interaction an advertisement for balance inquiry services that customers must click through before customers are ever allowed to make a cash withdrawal. FCTI inserts this advertisement at the outset of each ATM interaction because its customers' card-issuing banks are required to pay an interchange fee for each balance inquiry transaction transmitted by FCTI's ATMs to the card-issuing banks, pursuant to ATM network rules, with FCTI receiving a portion of each of these interchange fees. In other words, each balance inquiry transaction that FCTI's ATMs transmit results in additional interchange fee revenue paid to FCTI.

But FCTI exploits this system by programming its balance inquiry advertisements to register a second, unauthorized balance inquiry request – in violation of network rules – in order to double its interchange fee revenue.  Specifically, once the customer agrees to the balance inquiry prompt displayed at the outset of each interaction and is assessed an out-of-network ("OON") fee as a result, FCTI's ATMs display the next screen that provides the customer with their balance

information, while simultaneously asking if the customer would like to print that same balance information that the customer has already inquired and paid for and is currently staring the customer in the face *and* continue to make a cash withdrawal transaction. The only button options on this screen are "Cancel" or "Continue", with pressing the "Continue" button being the only evident way to proceed to the desired cash withdrawal, and with the press of the "Cancel" button resulting in entirely ending the ATM visit before the customer was ever able to withdraw cash.

This screen is simply not a balance inquiry prompt as a second balance inquiry *was not and could not be* instructed through this prompt. In fact, the financial industry at large, including one of the three primary ATM networks (the Pulse Network), FCTI's own sponsoring bank (Prosperity Bank), and the ATM manager of one of the largest card-issuing banks (Bank of America, N.A.), have all condemned this screen because it does not allow customers to instruct a balance inquiry. Instead, this screen prompt traps customers into pressing the "Continue" button in order for the customer to proceed to a cash withdrawal, and yet FCTI's ATMs have been uniformly programmed to automatically transmit a *second* balance inquiry request to the card-issuing bank, resulting in the assessment of a second OON balance inquiry fee ("OON Fee") to the customer and the payment of additional interchange fee revenue to FCTI. For precisely this reason, the Pulse Network has deemed this a violation of its network rules, and another ATM operator that utilizes a similar sequence of screens has programmed its ATMs to be able to print that already-inquired balance information without transmitting a second balance inquiry request to the customer's card-issuing bank. Nevertheless, FCTI continued to implement this ATM interface for over three years despite being fully aware throughout this entire period that it nearly doubled its interchange fee revenue for balance inquiries as a result of this unlawful practice.

Given the obvious deception, Plaintiff Jerome Polvay ("Mr. Polvay" or "Plaintiff") now seeks to certify a class alleging violations of New York's General Business Laws ("GBL") §§ 349 and 350 that is defined as:

> All holders of a checking account at one, or more, Banks[1] who were assessed more than one fee for a balance inquiry during the same visit at a FCTI ATM in the State of New York from May 1, 2018 to November 16, 2021 (the "Class").

The claims of the Class are ideally suited for class treatment. FCTI utilized a single, uniform ATM interface at all of its ATMs located at 7-Eleven stores throughout the state of New York. Class members were uniformly assessed double OON Fees for a single balance inquiry as a result of the uniform bait-and-switch screen prompt implemented in the ATM interface. FCTI received a portion of each interchange fee for each unauthorized balance inquiry its ATMs transmitted through this screen prompt. Furthermore, Class members and their individual damages may be ascertained through a Class-wide methodology, by identifying each card number that is associated with each instance of double balance inquiries of the same account registered within seconds apart (*i.e.,* during the same ATM visit) through FCTI's transactional data, and then cross-referencing these card numbers and transactions with each of the Banks – all of whom have confirmed as part of third-party discovery in this case that they have data to do so. In fact, Plaintiff's database expert has already successfully completed this analysis through a sample of Bank of America's transactional data. And for each instance of a double OON Fee assessed to each Class member, the statutory damages sought are uniformly set by GBL §§ 349 and 350.

Therefore, the proposed Class meets all requirements for certification under Rules 23(a) and 23(b)(3).

---

[1] "Banks" is defined as the following financial institutions: New York Community Bank; KeyBank; Webster Bank; M&T Bank; TD Bank; Community Bank; Citizens Bank; NBT Bank; Bank of America; and Wells Fargo.

## II.    STATEMENT OF FACTS

### A.    General Background

FCTI is a wholly-owned subsidiary of Japan-based Seven Bank with Seven & i Holdings as the ultimate parent company to both entities.[2] Seven & i Holdings also owns the largest convenience store chain in America, "7-Eleven."[3] In 2017, Seven Bank installed ATMs at approximately 8,000 7-Eleven convenience store locations and transferred its ATM business from the largest independent ATM operator, Cardtronics, Inc., to its wholly-owned subsidiary, FCTI.[4] As a result, FCTI has been the sole provider of ATM services to 7-Eleven convenience stores since mid-2017.[5] FCTI generates revenue by: 1) assessing surcharge fees on its customers' cash withdrawal transactions; 2) collecting interchange fees on those same cash withdrawal transactions from their customers' banks; and 3) by collecting interchange fees on balance inquiry transactions from their customers' banks.[6]  This case focuses exclusively on the balance inquiry transactions.

Most customers are utilizing FCTI ATMs as a matter of convenience to withdraw cash. Because independent ATM companies, including FCTI, generate interchange fee revenue on a per-transaction basis from their customers' banks, they have a financial incentive to increase the number of transactions that their customers perform at each ATM visit. Once a customer performs a valid balance inquiry transaction, FCTI's ATM sends the request to its transaction processor,

---

[2] *See* https://www.7andi.com/en/group/finance.html (last accessed Jan. 27, 2023) (identifying the Defendant and Seven Bank, Ltd as major subsidiaries in their financial services division); *see also* https://www.7andi.com/en/group/convenience_store_overseas.html (last accessed Jan. 27, 2023) (listing 7-Eleven as a major subsidiary).
[3] *Id.*
[4] https://www.atmmarketplace.com/news/seven-bank-blames-underperforming-7-eleven-atm-network-for-lost-revenue/ (last accessed Feb. 2, 2023) ("Seven Bank installed ATMs at approximately 8,000 7-Eleven locations after ending a long-term relationship with Cardtronics in mid-2017.").
[5] *See* Dkt. No. 35-5, at 15:21-16:13 ("Q. Does FCTI own the ATM machines that are present in the – in 7-Elevens currently? A. Yes, yes.").
[6] Dkt. No. 30, at ¶ 9.

FiServ.[7] FiServ formats the information into the appropriate computer code and transfers it across the appropriate network to the customer's card-issuing bank through the relevant ATM network and electronically provides a package of information, including the customers' card number, the ATM's Terminal ID, and the electronic request for the customer's balance.[8] The bank receives the information, matches the request to the customer's bank account number and provides the balance information back to the FCTI ATM over the network, where it is then displayed for the customer.[9] The banks then assess an OON Fee, *i.e.*, a balance inquiry transaction that was not performed at the customers' own bank,[10] and automatically pays an interchange fee through the relevant ATM network, pursuant to each network's rules, to FCTI[11] with FCTI receiving an average of $0.17 per balance inquiry transaction.[12]

**B.      FCTI's Deployment of the Continue/Cancel Prompt was Uniform.**

Shortly after FCTI acquired all of the ATM business for 7-Eleven convenience stores, Seven Bank exerted pressure on FCTI to dramatically increase revenue. FCTI CEO Robel Gugsa wrote on December 21, 2017, that FCTI had an "aggressive revenue target to meet for 2018" and that FCTI urgently wanted to develop "balance inquiry at start" prompts to deploy on its 7-Eleven ATM interfaces to generate more balance inquiry interchange revenue.[13] FCTI knew from the historic performance of its own ATMs that when balance inquiry at start prompting was deployed, it resulted in significantly greater balance inquiry interchange revenue.[14]

---

[7] *Id.*, at ¶ 5.
[8] Exhibit 1. All Exhibits are attached to the Declaration of Todd D. Carpenter ("Carpenter Decl."), filed concurrently herewith.
[9] Dkt. No. 30, at ¶ 5.
[10] *See e.g.*, Exhibit 2, at ¶ 4; Exhibit 3; Exhibit 4, at ¶ 4; Exhibit 5, at ¶ 4; Exhibit 6. at ¶ 4; Exhibit 7, at ¶ 4; Exhibit 8, at ¶ 4; Exhibit 9, at ¶ 4; Exhibit 10, at ¶ 4; Exhibit 11, at ¶ 4; Exhibit 12; Exhibit 13.
[11] *Id.*, at ¶ 9.
[12] Dkt. No. 35-11, at ¶ 25; Exhibit 14,  at 89:6-17.
[13] Dkt. No. 35-5, at pp. 30:1-31:9; *see also id.*, at p. 32:18-22.
[14] *Id.* at pp. 31:23-32:5

"Balance Inquiry at Start" is a common ATM industry advertising scheme that places an advertisement for the balance inquiry transaction at the very front of the customers' interaction with the ATM machine.[15] Every customer who utilized an FCTI ATM machine in the state of New York from May 1, 2018, to November 16, 2021, was presented with the same initial advertising prompt, which asks: "Would you like to view your account balance?"[16] This advertisement for the balance inquiry service appears immediately after the customer enters their debit card PIN, in place of a traditional "Main Menu" screen prompt. That is because most customers when presented with a traditional "Main Menu" screen at a bank-owned ATM would simply proceed to their cash withdrawal and bypass making a balance inquiry.[17] For FCTI, utilizing the "Balance Inquiry at Start" advertisement was an effective way to add an additional transaction to the customer's cash withdrawal ATM visit – resulting in additional interchange fee revenue for FCTI.[18]

As a result, CEO Gugsa told FCTI's software developer, Diebold Nixdorf, that they had to accelerate the balance inquiry development and find a "*quick and dirty*" method to get the balance inquiry at start prompting out in the 7-Eleven ATM fleet so that FCTI could meet its revenue threshold.[19] But, Diebold Nixdorf struggled to develop the proper balance inquiry interface screen and repeatedly failed to meet FCTI's internal deadlines. On March 30, 2018, Gugsa exploded in an email to Diebold:

> Sorry but this is unacceptable […] I have significant revenue projections to meet with Bal Inq. Project […] I will not accept holidays as an excuse […] I need a partner that can MAKE IT HAPPEN![20]

---

[15]   *See*   http://www.atmatom.com/5-ways-to-boost-atm-portfolio-profitability/   (last accessed Feb. 3, 2023).
[16] Dkt. No. 28-1, at FCTI000047; Dkt. No. 35-5 at 117:5-13.
[17] *See, e.g.*, Exhibit 15, at pp. 62:23-63:15.
[18] Dkt. No. 35-5, at pp. 31:23-32:5.
[19] Dkt. No. 35-6.
[20] Dkt. No. 35-7.

When the balance inquiry screens were finally delivered, FCTI rushed a fatally flawed balance inquiry interface software to market at the beginning of May 2018.[21] Below are the FCTI "Balance Inquiry at Start" screen prompts that appeared at all 7-Eleven FCTI ATMs during the class period.[22] Following the entry of the customers' debit card PIN the customer would select their language preference. Immediately thereafter, the Balance Inquiry at Start prompt screen ("BI Screen") would appear as follows:[23]



If the customer selects the "Yes" button, the customer is next prompted to choose from which account he would like his balance information: Checking; Savings or Credit Card.[24] After that selection is made, the available balance is provided on another, deceptive balance inquiry prompt ("Continue/Cancel Prompt"):[25]

---

[21] Dkt. No. 35-5, at pp.73:21-74:10.
[22] *Id.* p.117:5-13; referencing Dkt. No. 28-1.
[23] Dkt. No. 28-1, at FCTI000047.
[24] Dkt. No. 28-1, at FCTI-000048.
[25] Dkt. No. 35-5, at p. 118:11-18; Dkt. No. 28-1, at FCTI000049.



The Continue/Cancel Prompt, above, appears once the customer has selected "Yes" to the BI Screen above and chosen the account from which they want to inquire their balance.[26] As a result, FCTI has sent a balance inquiry package to its processer, FiServ, which routes the request to the customer's Bank through the relevant ATM network and the Bank responds with the customer's available balance – in this example: $7,648.00.[27] At this moment in the transaction, the customer's Bank has sent the customer's available balance information and ***automatically assessed*** that customer one OON Fee, and will automatically pay an interchange fee to the ATM network, a portion of which will be paid to FCTI.

The fraudulent scheme in the FCTI interface is exposed by what happens next. By pressing the "Continue" button on the Continue/Cancel Prompt, the balance that is displayed on the screen (that the customer has already paid for) is then printed onto a receipt and FCTI communicates a ***second balance inquiry*** request to the customer's Bank.[28] Bank customers are then assessed a second OON Fee for

---

[26] Dkt. No. 35-5, at p. 118:19-120:10.
[27] *Id*. at p.118:19-119:10.
[28] *Id*. at p.119:22-120:3.

printing the balance that was *already* inquired, purchased and displayed on the screen. The Continue/Cancel Prompt is simply not a balance inquiry screen, but because FCTI rushed the BI Screen and the Continue/Cancel Prompt to market, FCTI was initially unaware it had caused this to happen.[29] Remarkably, CEO Gugsa testified that even after they discovered this mistake in the design of their interface, FCTI had no intention of changing their practice. He testified that it was not his concern.[30] He was content to reap the rewards of this fraud to satisfy his corporate revenue "pressure."

## C.   FCTI's Liability will be Established with Common Proof

Common evidence establishes that one financial institution objected to the Cancel/Continue Prompt because it determined that the Cancel/Continue Prompt was not a proper balance inquiry prompt.[31] This resulted in the Pulse Network reaching out to FCTI's sponsoring bank, Prosperity Bank, and together forcing FCTI to change the Cancel/Continue Prompt because Pulse Network found that FCTI violated "Section 8.2.7(iii)" of its network rules which states: "Prohibited Transactions—No ATM may process or return an inquiry unless **affirmatively requested** by Customer. (Inquiries cannot be submitted by default.)."[32] Pulse Network then demanded that "this [Continue/Cancel Prompt] be discontinued promptly."[33] Pulse Network's Compliance Department found that:

> [I]n the [Continue/Cancel Prompt] you shared, the cardholder has already received the result of the Inquiry (visible on the screen). The question the cardholder is "affirmatively agreeing to" is "would you like to print your Balance and continue the Transaction?" [...] ***In this case, the Customer is only affirmatively agreeing to two things: 1) they would like to print the balance they can already see on the screen; and 2) the Cardholder would like to continue the same Transaction***

---

[29] *Id.* at p.122:9-20

[30] Exhibit 14, at p. 127:25-128:21.

[31] Dkt. No. 35-2 ("It has come to our attention from an issuer [i.e., financial institution] that FCTI is charging cardholders twice for what the cardholder feels is a single balance inquiry."); (Bank of America's ATM Channel Manager stating the Continue/Cancel Prompt would be "printing my balance and continuing to perform another transaction" and "would not be charged for two balance inquiries if I continued.").

[32] Dkt. No. 35-3, at FCTI 0493 (emphasis added).

[33] Exhibit 16, at FCTI 0490.

*(presumably to withdraw funds).* The Compliance Department does not believe a
reasonable person would interpret this question to mean the cardholder is actually
requesting a second [balance] Inquiry.[34]

Likewise, the ATM Channel Manager for Bank of America, the operator of one of the largest ATM

fleet in the country, testified that he understood that the Continue/Cancel Prompt would be for

"printing my balance and continuing to perform another transaction" and that he "would not be

charged for two balance inquiries if I continued."[35] Pulse Network's and Bank of America's ATM

Channel Manager's evaluation of FCTI's Continue/Cancel Prompt correctly reflects the reality of

the service being advertised and the bait-and-switch nature of FCTI's Continue/Cancel Prompt.[36]

**D.      The Banks Uniformly Receive FCTI's Balance Inquiry Requests and Uniformly
         Assess OON Fees**

After customers select "Continue" on the Continue/Cancel Prompt, FCTI communicates to

the customers' Banks that an additional balance inquiry has occurred, in the same manner as

described above.[37] Customers in the proposed class, including Mr. Polvay, were then assessed a

second OON Fee by their respective Banks for balance inquiries they did not instruct.[38] Mr. Polvay

banks at TD Bank and was an assessed a second $3.00 OON Fee as a result of FCTI's conduct.[39]

Each of the ten (10) Banks identified in Mr. Polvay's proposed Class definition assesses OON

Fees for balance inquiry requests sent by FCTI ATMs:[40]

---

[34] *Id.* (emphasis added).
[35] Dkt. No. 35-9, at 93:9-94:17
[36] Moreover, FCTI's asserted defense that it was impossible to subsequently print the balance information without transmitting a second balance inquiry is belied by the fact that other ATM operators, including Provident Bank, were able to do so.  Exhibit 17, Provident Decl., at ¶ 6 ("The Bank's ATMs only transmit a single balance inquiry request [...], even when the customer elects to print the balance information already inquired and presented on the screen.")
[37] *See, supra,* pp. 3-4.
[38] Dkt. No. 34, at ¶ 6; *see* Exhibit 2, at ¶ 5; *see also* Exhibit 3.
[39] Dkt. No. 34, at ¶¶ 4, 6.
[40] Exhibit 4, at ¶ 4; Exhibit 5, at ¶ 4; Exhibit 6. at ¶ 4; Exhibit 7, at ¶ 4; Exhibit 8, at ¶ 4; Exhibit 9, at ¶ 4; Exhibit 10, at ¶ 4; Exhibit 11, at ¶ 4; Exhibit 12; *see* Exhibit 13.

| FINANCIAL INSTITUTION | OON FEE FOR BALANCE INQUIRIES |
|---|---|
| TD Bank | $3.00 |
| ███████████████ | ████ |
| | |
| Webster Bank | $2.50 to $3.00 |
| ████████ | |
| Community Bank | $1.00 |
| Citizens Bank | $3.00 |
| NBT Bank | $0.50 |
| ████████ | █████████████████████████ |
| Bank of America | $2.50 |

### E.    Plaintiff has Established a Methodology to Ascertain Class Membership and Damages.

A large swath of New York consumers has been affected by FCTI's Continue/Cancel Prompt. For example, Mr. Polvay's expert, Art Olsen, was able to run an analysis of consumers who held checking accounts at Bank of America that used FCTI ATMs on a nationwide basis and found that 76.35% of all OON Fees for a balance inquiry at FCTI ATMs were immediately followed by a second OON Fee for a balance inquiry of the same account, resulting in 65,543 unique accounts were double charged balance inquiries during a two-month period.[41] The number of unique accounts that have been double charged for OON balance inquiries as a result of FCTI's fraudulent Continue/Cancel Prompt for the ten (10) Banks identified over the roughly three-and-a-half-year class period is likely several million.

### III.    LEGAL STANDARD

A party seeking class certification must satisfy the requirements of Rule 23(a) and at least one subsection of Rule 23(b). Fed. R. Civ. P. 23. The Court has broad discretion to grant class certification. *See Ligon v. City of New York*, 288 F.R.D. 72, 78 (S.D.N.Y. Feb. 11, 2013) (citing *Parker v. Time Warner Entm't Co. L.P.*, 331 F.3d 13, 28 (2nd Cir. 2003)). Here, Mr. Polvay seeks

---

[41] Dkt. No. 35-11 at ¶ 23; Dkt. No. 35-10, at ¶ 22.

certification under Rule 23(b)(3). "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (citation omitted).

## IV.    ARGUMENT

### A.    Mr. Polvay and the Proposed Class Satisfy the Rule 23(a) Prerequisites

Rule 23(a) sets forth four prerequisites for class certification, generally known as: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. Fed. R. Civ. P. 23(a). Each of these requirements is met here.

#### 1.    Numerosity

Rule 23(a)(1) requires the class to be so numerous that joinder of individual class members is impracticable. Fed. R. Civ. P. 23(a)(1). Numerosity is no issue here. Mr. Olsen, Mr. Polvay's expert, was able to run an analysis of consumers who held checking accounts at Bank of America, N.A. and used FCTI ATMs, nationwide, to determine that 65,543 unique accounts were charged double balance inquiries during a single transaction during May and June 2018.[42] FCTI has approximately 631 ATMs in New York.[43] Given that this case is not limited to a single financial institution, there can be no question that numerosity is met. *See e.g., Ligon*, 288 F.R.D. at 79 ("In the Second Circuit, sufficient numerosity can be presumed at a level of forty members or more") (citing *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2nd Cir. 1995)).

#### 2.    Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality is determined by whether the issues raised have "the capacity of

---

[42] Dkt. No. 35-11 at ¶ 23; Dkt. No. 35-10, at ¶ 22.
[43] Exhibit 18.

a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal citations omitted). It is not required that all questions of fact or law be common, or that the entire case can be resolved on a common basis, so long as "an issue that is central to the validity of each one of the claims" is "capable of classwide resolution." *Id.* Even a single common question that fits that criteria will satisfy commonality. *Id.* at 369.

This case concerns FCTI's uniform use of its Continue/Cancel Prompt on all of its ATMs in New York, which systematically resulted in consumers being assessed a second OON Fee for the alleged "balance inquiry" deceptively advertised as the Continue/Cancel Prompt. Commonality is easily satisfied in cases such as this one where uniform legal determination will be made based upon uniform ATM prompts. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) ("Commonality is satisfied where a single issue of law or fact is common to the class") (internal citations omitted).

The core legal and factual questions that will drive resolution of the claims here are common to the Class and include:

- Is FCTI's Continue/Cancel Prompt a consumer-oriented product or service?

- Is FCTI's Continue/Cancel Prompt, which results in a second balance inquiry during the same transaction, materially misleading, thereby violating GBL § 349?

- Is FCTI, as it claimed in its Motion for Summary Judgment, advertising – falsely – a balance inquiry prompt under disguise as the Continue/Cancel Prompt, thereby violating GBL § 350?[44]

Accordingly, commonality is satisfied here.

---

[44] *See* Dkt. No. 14, at ¶ 48; *see also* Dkt. No. 27, at pp. 14, 20, 22-24.

3.      **Typicality**

Pursuant to Rule 23(a)(3), typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove FCTI's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 276 (2nd Cir. 1997) (citations omitted). "Rather than focusing on the precise nature of plaintiffs' injuries, the typicality requirement may be satisfied where 'injuries derive from a unitary course of conduct by a single system.'" *Ligon*, 288 F.R.D. at 78 (quoting *Marisol A.*, 126 F.3d at 377); *see also Robidoux v. Celani*, 987 F.2d 931, 937 (2nd Cir. 1993) ("the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.").

Here, on October 12, 2021, while on a trip to New York City, Mr. Polvay used his TD Bank-issued debit card, linked to his checking account, to withdraw cash from a FCTI ATM.[45] While using FCTI's ATM, he was presented with the Continue/Cancel Prompt after inquiring about his balance.[46] Mr. Polvay was confused by the Continue/Cancel Prompt and did not want to cancel his transaction so he pressed continue but did not believe he would be conducting a balance inquiry since his balance was displayed on the screen.[47]

Mr. Polvay's claims are typical of the Class because his claims arise out of the same conduct by FCTI and are based on the same legal theories as the absent Class members. When using the FCTI ATM, Mr. Polvay was forced to go through the Continue/Cancel Prompt after

---

[45] Dkt. No. 34, at ¶ 3; Dkt. No. 35-8, at 19:20-20:9.
[46] Dkt. No. 34, at ¶ 5; Dkt. No. 35-8, at 76:18-77:13.
[47] Dkt. No. 34, at ¶ 5; Dkt. No. 35-8, at 71:18-21; 72:11-73:11; 73:19-74:17; *see also* Dkt. No. 35-8, at 80:22-81:17 ("Q. Did you expect to be charged a fee by the bank for printing your account balance on a piece of paper? [Mr. Polvay] A. No. Because it wasn't a balance inquiry. I already had my balance."); *id.*, at 83:10-22 ("Q. So you already had your balance and you thought you'd be charged for that. Why did you think that you -- so you then pressed a button that said I want to -- you then pressed a button that said the machine would print your balance and you understood your balance would be printed. Why did you think you wouldn't get charged for also printing your balance? [Mr. Polvay] A. Because I didn't think it was a balance inquiry. I already had my balance. Q. Did you think you'd only be charged for balance inquiries? [Mr. Polvay] A. Yes.").

already inquiring about his balance.[48] Like all Class members, he was only given the option to "Continue [the transaction]" or "Cancel [the transaction]."[49] Mr. Polvay pressed continue and was assessed an OON Fee by his bank, just as the absent Class members were.[50] His bank assessed the OON Fee for a "second balance inquiry" as a direct result of FCTI bait-and-switch scheme of transmitting a balance inquiry request through this non-balance-inquiry prompt.[51]

The Class's claims are based on the same general set of facts as Mr. Polvay's claims. Therefore, typicality is satisfied.

### 4.    Adequacy

"The adequacy requirement is satisfied where: (1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has sufficient interest in the outcome of the case to ensure vigorous advocacy." *Kaplan v. Gelfond*, 240 F.R.D. 88, 94 (S.D.N.Y. 2007); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2nd Cir. 2006).

Mr. Polvay's interests and the Class's interests are aligned in determining whether FCTI violated GBL §§ 349 and 350. As such, his interests are coextensive, and not antagonistic, of the Class's interests.[52] Furthermore, Mr. Polvay has been an active participant in this litigation, including participating in the creation of and reviewing the pleadings, responding to written discovery, sitting for his deposition, and participating in periodic conferences with his counsel.[53]

---

[48] Dkt. No. 34, at ¶ 5; Dkt. No. 35-8, at 76:18-77:13.
[49] Dkt. No. 34, at ¶ 5; Dkt. No. 35-8, at 71:18-74:17.
[50] *Id.*; *see* Dkt. No. 34, at ¶ 6; *see also* Exhibit 2, at ¶ 4; Exhibit 3; Exhibit 4, at ¶ 4; Exhibit 5, at ¶ 4; Exhibit 6. at ¶ 4; Exhibit 7, at ¶ 4; Exhibit 8, at ¶ 4; Exhibit 9, at ¶ 4; Exhibit 10, at ¶ 4; Exhibit 11, at ¶ 4; Exhibit 12; *see* Exhibit 13.
[51] Dkt. No. 32-2 ("It has come to our attention from an issuer that FCTI is charging cardholders twice for what the cardholder feels is a single balance inquiry. […] We feel that this is a prohibited transaction under Section 8.2. 7 of the PULSE [Network] Rules.").
[52] *See* Declaration of Mr. Polvay ("Polvay Cert Decl.") at ¶ 3.
[53] *Id.*, at ¶¶5-6-; *see* Carpenter Decl., at ¶ 14.

He intends to vigorously prosecute this action on behalf of the Class that he seeks to represent.[54] Additionally, Mr. Polvay has retained qualified and competent counsel extensive experience and expertise prosecuting complex class actions, including consumer actions against major financial institutions similar to this action.[55] Class Counsel has devoted substantial time and resources to the action and will vigorously protect the interests of the Class.[56] Therefore, adequacy is met.

**F.      The Class Should be Certified Under Rule 23(b)(3)**

In addition to the prerequisites set forth by Rule 23(a), a class seeking to be certified must also constitute one of the types of classes set forth under Rule 23(b). Fed. R. Civ. P. 23(b). Under Rule 23(b)(3), certification is appropriate if: (i) questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (ii) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *see Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 148 (S.D.N.Y. 2002) (common questions of fact or law must predominate); *see also United States v. City of New York*, 276 F.R.D. 22, 29 (E.D.N.Y. 2011) (common questions must predominate and class-wide resolution must be superior). Both requirements are satisfied here.

**1.      Common Issues Predominate**

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2nd Cir. 2002). As such, "[t]he mere existence of individual issues will not be sufficient to defeat certification." *Sykes v.*

---

[54] Polvay Cert Decl., at ¶ 4.
[55] Carpenter Decl. ¶¶ 2-15.
[56] *Id.*, at ¶ 15.

*Mel S. Harris and Associates LLC*, 780 F.3d 70, 87 (2nd Cir. Feb. 10, 2015). The requirement does not demand a plaintiff to "prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Sykes*, 780 F.3d at 81 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 468 (2013)).

Predominating this litigation is the question: whether FCTI's Continue/Cancel Prompt is deceptive, and a balance inquiry falsely disguised as the choice to continue the consumer's transaction. *See*, *supra*, Section IV.A.2.

More specifically, GBL § 349 provides a cause of action for any person injured by "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a), (h). "Deceptive acts" are acts that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). Additionally, "[s]ection 350 of the GBL prohibits '[f]alse advertising in the conduct of any business, trade or commerce,' and is analyzed under the same 'reasonable consumer' standard as Section 349." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 500 (2d Cir. 2020). Moreover, "[t]he standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." *Eidelman v. Sun Products Corp.*, 2022 WL 1929250 at *1 (2nd Cir. 2022) (citing *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y. 2d 314, 324 n.1 (2002)). "To succeed under either section, a plaintiff must show 'that [FCTI] has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F.Supp.3d 400, 412 (S.D.N.Y. Jan. 15, 2018) (citing *Olander v. Staples, Inc.*, 802 F. 289, 300 (2nd Cir. 2015). Reliance is not an element and plaintiffs

17

only need show that a "material deceptive act" caused the injury. *Stutman v Chemical Bank*, 95 NY2d 24, 29 (2000); *see Baron v Pfizer, Inc*., 42 AD3d 627, 628 (2007).

These issues are resolved using an objective standard, which is applicable to all members of the Class, including Mr. Polvay. *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014) ("The New York Court of Appeals has established an objective standard for determining whether acts or practices are materially deceptive or misleading to a reasonable consumer acting reasonably under the circumstances.") (internal citations omitted); *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26, 647 N.E.2d 741, 745 (1995) (adopting an objective standard for deceptive acts and/or practices). The fundamental questions of whether FCTI's Continue/Cancel Prompt is consumer oriented, materially misleading, and resulted in injury are common questions of law and fact. *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 548 (E.D.N.Y. 2017) (finding common questions predominated where questions revolved around whether "[t]he product was not what it said it was."); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 568 (S.D.N.Y. 2014) (Rakoff, J.) (finding predominance was satisfied because "every class member saw the same representation that Capatriti was "100% Pure Olive Oil" because the statement appeared in large letters on the front, back, left, right, and top of the tin. The same generalized evidence will be used to establish whether Capatriti's label is false, and if so, whether it was likely to mislead a reasonable consumer acting under the circumstances.") (internal citations omitted). Thus, FCTI's liability under GBL §§ 349 and 350 is also a question common to the Class, including Mr. Polvay. *See Price v. L'Oreal USA, Inc.*, No. 17 CIV. 614 (LGS), 2018 WL 3869896, at *6 (S.D.N.Y. Aug. 15, 2018) ("Classwide evidence will be used to establish whether Defendants' labeling was deceptive, and if so, whether it was likely to mislead a reasonable consumer acting reasonably under the

circumstances."); *Sharpe v. A&W Concentrate Co.*, No. 19-CV-768 (BMC), 2021 WL 3721392, at *6 (E.D.N.Y. July 23, 2021) ("*all* elements of liability – the consumer-oriented conduct, the materially misleading statement, and the resulting injury – will depend on classwide proof.") (emphasis in original).

Indeed, numerous courts have certified classes for GBL §§ 349 and 350 claims. *See, e.g., Sykes v. Mel Harris and Associates, LLC*, 285 F.R.D. 279, 293 (S.D.N.Y. Sep. 4, 2012) (certifying GBL § 349 class when "[e]very potential class member's claim arises out of defendants' uniform, widespread practice."); *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 389 (S.D.N.Y. Oct. 4, 2016) (certifying GBL § 349 class because "the potentially common question of whether a given product's advertising [...] is misleading can be measured under an objective standard."); *Hasemann v. Gerber Products Co.*, 331 F.R.D. 239, 274 (E.D.N.Y. Mar. 31, 2019) (certifying GBL §§ 349, 350 class and reasoning that "[t]he objective standards— including whether the representations would likely have mislead a reasonable consumer— underlying the elements [...] render them particularly well-suited to generating common questions); *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D.418, 423 (S.D.N.Y. Mar. 19, 2009) (certifying GBL §§ 349, 350 class where the alleged injury concerned defendant's deceptive corporate policy); *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *9 (S.D.N.Y. Mar. 19, 2019) (certifying GBL §§ 349, 350 class and reasoning that materiality under GBL §§ 349, 350 "is an objective question" and thus "whether the [at issue] logo was misleading [...] will not call for individualized factual determinations.").[57]

---

[57] *See also In re Scotts EZ Seed Litigation*, 304 F.R.D. 397, 416 (S.D.N.Y. Jan. 26, 2015) (certifying GBL §§ 349, 350 class); *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 346 (S.D.N.Y. April 23, 2021) (same); *Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125, 149 (S.D.N.Y. May 14, 2014) (certifying GBL § 349 class); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (E.D.N.Y. Jan. 31, 2008) (same).

Furthermore, any statute of limitations issues can also be resolved on a class-wide basis. Here, the statute of limitations of GBL §§ 349 and 350 is three (3) years. *Goldemberg*, 317 F.R.D. at 386, n.10. However, the claims of the Class are tolled since May 1, 2018, when FCTI instituted the challenged uniform ATM interface at all 7-Eleven stores throughout the country, because a prior action, *Kristen Schertzer, et al. v. Bank of America, N.A., et al.,* No. 3:19-cv-00264-JM-MSB (S.D. Cal.) ("*Schertzer*") – wherein the Second Amended Complaint that was filed on May 1, 2018, included a nationwide class against FCTI that encompassed the claims asserted here. Specifically, that case alleged a class as defined as: "All holders of a checking account in the United States who, within the applicable statute of limitation preceding the filing of this lawsuit, were assessed one or more fees for purportedly undertaking a balance inquiry as part of a cash withdrawal at a FCTI ATM (the 'National FCTI Class')."[58] As this complaint was filed within three years of May 1, 2018, and class certification was not decided in this prior nationwide class asserted against FCTI in *Schertzer*, the statute of limitations for the Class's claims are tolled so as to cover the entire class period asserted here.[59] *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 555 (1974) (establishing rule to toll the statute of limitations when a class suit is instituted); *Famular v. Whirlpool Corp.*, No. 16 CV 944 (VB), 2021 WL 395468, at *2 (S.D.N.Y. Feb. 3, 2021) ("the policies underlying New York's class action statute are furthered by permitting cross-jurisdictional tolling of these class claims."); *MSP Recovery Claims, Series LLC v. Takeda Pharms. Am., Inc.*, No. 19 CIV. 5610 (NRB), 2021 WL 4461773, at *9 (S.D.N.Y. Sept. 29, 2021) (finding plaintiffs' New York state claims were tolled under *American Pipe* as the claims were based on the same misrepresentations). In any event, tolling of the statute of limitations under *American Pipe* is a

---

[58] Exhibit 19, at ¶ 193.
[59] Carpenter Decl. at ¶ 16 (confirming no decision was rendered on certifying the nationwide FCTI class); Exhibit 19, at ¶ 193.

class-wide issue and should not preclude class certification. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 128 (2d Cir. 2013) (affirming the district court's finding that common questions predominated whether statute of limitations was tolled); *In re Sumitomo Copper Litig.*, 194 F.R.D. 480, 482 (S.D.N.Y. 2000) (tolling of limitations period could be resolved with class-wide evidence).

The predominating questions of law and fact here are further demonstrated by the common evidence the Class, and Mr. Polvay, will present, which includes but is not limited to: (1) FCTI's uniformly presented Continue/Cancel Prompt; (2) documents demonstrating FCTI's transmission of a balance inquiry request in response to consumer input on the Continue/Cancel Prompt violates ATM network rules; and (3) FCTI's admission that the Continue/Cancel Prompt is advertising a service.[60] Individual issues concerning the amount of damages each Class member, including Mr. Polvay, suffered does not defeat predominance. *See Sykes*, 780 F.3d at 87 (affirming trial court's certification of class alleging GBL § 349 as individual issues of damages did not predominate); *Goldemberg*, 317 F.R.D. at 399 (finding individualized damages did not defeat the predominance of the common questions).

Therefore, common issues predominate over any individualized issues concerning the Class and Mr. Polvay.

### 2.   Class Membership and Damages are Ascertainable

The Second Circuit has "recognized an implied requirement of ascertainability in Rule 23." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2nd Cir. 2015) (internal quotation marks omitted). "The ascertainability doctrine that governs in [the Second] Circuit requires only that a

---

[60] Dkt. No. 28-1 at FCTI000047, FCTI000049; Dkt. No. 32-2; Dkt. No. 27, at pp. 22-24 ("The language on the [FCTI] ATM screens was limited to asking customers what services the customer wanted the ATM to provide.").

class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Securities*, 862 F.3d 250, 264 (2nd Cir. 2017). It is a "'modest threshold requirement' that precludes certification 'only [...] if a proposed class definition is indeterminate in some fundamental way.'" *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324, 340 (S.D.N.Y. April 23, 2021) (quoting *In re Petrobras Securities*, 862 F.3d at 269).

Here, Mr. Olsen can ascertain Class membership and determine damages for each member of the Class, including Mr. Polvay, through an algorithm without individual analysis.[61] FCTI has stored in its transactional database all of the information necessary, including the card-issuing bank, type of transaction, terminal ID number, location, and date and time, to be able to identify through an algorithm only those balance inquires transpiring at FCTI machines located in 7-Elevens in New York during the proposed class period that resulted in two balance inquiry requests of the same account within seconds apart undertaken by customers of each Bank.[62] The card numbers and transactions identified by this process can then be cross-matched with the data of each of the Banks – all of which have confirmed through declarations that they have all of the necessary data – to identify each Class member and whether a second OON Fee was assessed.[63] Determining the statutory damages for each Class member would simply require multiplying each instance of the second OON Fee by $50 pursuant to GBL § 349, and by $500 pursuant to GBL § 350.[64]

---

[61] Dkt. No. 35-11, at ¶ 15.
[62] *Id.* at ¶ 21.
[63] *Id.* at ¶ 22; Exhibit 2, at ¶ 4; Exhibit 3; Exhibit 4, at ¶ 4; Exhibit 5, at ¶ 4; Exhibit 6. at ¶ 4; Exhibit 7, at ¶ 4; Exhibit 8, at ¶ 4; Exhibit 9, at ¶ 4; Exhibit 10, at ¶ 4; Exhibit 11, at ¶ 4; Exhibit 12; *see* Exhibit 13.
[64] Dkt. No. 35-11, at ¶ 26. The Class, and Mr. Polvay, are entitled to statutory damages because each transaction that was in violation of GBL §§ 349 and 350 was less than the statutory damages. *See* GBL § 349 (McKinney) (injured consumers may "recover [their] actual damages or fifty dollars, whichever is greater"); GBL § 350-e (McKinney) (injured consumers may "recover [their] actual damages or five hundred dollars, whichever is greater"); *see also Famular*, 2019 WL

This type of damages calculations and method of ascertainability have been accepted by numerous other courts. *See e.g.*, *In re Amla Litig.*, 328 F.R.D. 127, 136 (S.D.N.Y. 2018) ("The Court notes that the damages methodology proposed by plaintiffs - multiplying the number of New York purchases of the product by $50 - is quite reliable, since [GBL] § 349 provides for statutory damages."); *Rodriguez v. It's Just Lunch Int'l*, No. 07-CV-9227 (SHS), 2018 WL 3733944, at *8 (S.D.N.Y. Aug. 6, 2018) (approving method to ascertain class based on the defendant's records); *Kurtz*, 321 F.R.D., at 550 (relying on statutory damages is a method for calculating damages).

Moreover, such processes for ascertaining class membership have also been accepted in analogous scenarios. *In Gawarecki v. ATM Network, Inc.*, No. 11-CV-1923 SRN/JJG, 2014 WL 2600056 (D. Minn. June 10, 2014), a case similarly involving ATM overcharges, the ATM operator-defendant argued it would be difficult to identify and notify class members because defendant did not have access to the names and addresses of the ATM users and would have to seek that information from the party that processes the ATM transactions and the users' financial institutions. *Id.* at *16-17. The court rejected this argument because defendant's daily terminal detail results, like here, revealed sufficient identifying information for members of the class, such as the personal account number and the bank identification number. *Id.* at *17. Thus, defendant's records were sufficient to ascertain class members and to provide notice. *See also Sykes*, 285 F.R.D. at 292-293 (certifying class where defendants' business records and New York City civil court records were sufficient to determine class membership status); *Famular*, 2019 WL 1254882, at *5 (finding ascertainability satisfied when plaintiff's proposed methodology to determine class

---

1254882, at *11 (each unit sold was a violation of GBL §§ 349 and 350); *Chery v. Conduent Educ. Servs., LLC*, No. 1:18-CV-75, 2022 WL 179876, at *10 (N.D.N.Y. Jan. 20, 2022) (rejecting argument that damages should be calculated per class member not per each instance of deceptive conduct).

membership was from "the records of defendant and four primary retailers and distributors in New York.").

Here, once the Class is certified, Mr. Polvay will, likewise, request an opportunity to seek FCTI's full transactional account data that it stored during the relevant period. Plaintiff will then provide the filtered card number and transaction information to the Banks, thereby significantly reducing the burden on the Banks in cross-referencing this information with its own transactional data in producing the most streamlined set of data for identifying each Class member and their individual damages.[65] Therefore, the Class members and their damages are ascertainable.

### 3.    A Class Action is Superior to Other Methods of Adjudication

Rule 23(b)(3) sets forth the following factors to consider when determining whether a class action is the superior form of adjudication: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23. "While Rule 23(b)(3) sets out four individual factors for courts to consider, manageability is, by the far, the most critical concern in determining whether a class action is a superior means of adjudication." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 463 (S.D.N.Y. 2018) (internal citations omitted). However, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *In re Petrobras Sec.*, 862 F.3d 250, 268 (2d Cir. 2017) (internal citations omitted).

---

[65] Dkt. No. 35-11, at ¶ 22.

Here, the superiority requirement is clearly met. Each Class member's individual claim is valued at, generally, $3.00 or less per deceptive balance inquiry at FCTI's ATMs in New York.[66] Absent a class action, recovery for the Class would not be economically feasible given the high costs of litigation. *See Pyke v. Cuomo*, 209 F.R.D. 33, 47 (N.D.N.Y. 2002) (class certification was superior method of adjudication where not finding so "would exponentially increase the costs of litigation for all, and would be a particularly inefficient use of judicial resources") (internal citations omitted); *Reyes v. Altamarea Grp., LLC*, No. 10-CV-6451 RLE, 2011 WL 4599822, at *3 (S.D.N.Y. Aug. 16, 2011) ("The Plaintiffs and class members have limited financial resources with which to prosecute individual actions. […] Employing the class device here will not only achieve economies of scale for class members, but will also conserve judicial resources and preserve public confidence in the integrity of the system by avoiding the waste and delay repetitive proceedings and preventing inconsistent adjudications."). Thus, a class action is the superior method of adjudicating the case.

## V.    CONCLUSION

For the foregoing reasons, Mr. Polvay respectfully requests that the Court certify the Class.

Dated: February 3, 2023                          **LYNCH CARPENTER, LLP**

                          By:   */s/ Todd D. Carpenter*
                                Todd D. Carpenter*
                                todd@lcllp.com
                                (Eddie) Jae K. Kim*
                                ekim@lcllp.com
                                Tiffine E. Malamphy*
                                tiffine@lcllp.com
                                1350 Columbia St., Ste. 603
                                San Diego, California 92101
                                Telephone:    (619) 762-1900

---

[66] *See* Exhibit 2, at ¶ 4; Exhibit 3; Exhibit 4, at ¶ 4; Exhibit 5, at ¶ 4; Exhibit 6. at ¶ 4; Exhibit 7, at ¶ 4; Exhibit 8, at ¶ 4; Exhibit 9, at ¶ 4; Exhibit 10, at ¶ 4; Exhibit 11, at ¶ 4; Exhibit 12; *see* Exhibit 13; *see also, supra,* Section II.D.

**LYNCH CARPENTER, LLP**
Gary F. Lynch
gary@lcllp.com
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone:     (412) 322-9243

*Attorneys for Plaintiff and the Proposed Class*
*\*Admitted Pro Hac Vice*